FILED

2021 Oct-07  PM 04:11
U.S. DISTRICT COURT
N.D. OF ALABAMA

## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | | |
|---|---|---|
| **GEORGE CORAM,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | Civil Action Number |
| **v.** | ) | **2:20-CV-00781-AKK** |
| | ) | |
| **SOUTHWIND** | ) | |
| **TRANSPORTATION, INC., et al.,** | ) | |
| | ) | |
| **Defendants.** | | |

## <u>MEMORANDUM OPINION</u>

This case arises from a highway collision between George Coram and David Todd Hagins,[1] who was driving a tractor-trailer owned by Lazaro P. Calvo, Inc., while working for Southwind Transportation, Inc. at the time of the incident. Coram alleges negligence and/or wantonness and negligent entrustment, hiring, and/or supervision. *See* doc. 12. The defendants move for partial summary judgment as to wantonness and negligent entrustment, hiring, and/or supervision. Docs. 27–28. The motion is fully briefed, docs. 30–32, and due to be granted.

## I.

Under the Federal Rules of Civil Procedure, summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the

---

[1] Hagins passed away on August 10, 2021. *See* docs. 28 at 1; 33.

movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56. "Rule 56[]

mandates the entry of summary judgment, after adequate time for discovery and

upon motion, against a party who fails to make a showing sufficient to establish the

existence of an element essential to that party's case, and on which that party will

bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)

(alteration in original). The movant bears the initial burden of proving the absence

of a genuine issue of material fact. *Id*. at 323. The burden then shifts to the

nonmoving party to "go beyond the pleadings" and establish a "genuine issue for

trial." *See id*. at 324. A dispute about a material fact is genuine "if the evidence is

such that a reasonable jury could return a verdict for the nonmoving party."

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A "mere 'scintilla' of

evidence supporting the opposing party's position will not suffice; there must be

enough of a showing that the jury could reasonably find for that party." *Walker v.

Darby*, 911 F.2d 1573, 1577 (11th Cir. 1990).

At summary judgment, the court must construe the evidence and all

reasonable inferences arising from it in the light most favorable to the nonmovant.

*Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 157 (1970); *Anderson*, 477 U.S. at 255.

Factual disputes are resolved in the nonmoving party's favor when sufficient

competent evidence supports the nonmoving party's version of the facts. *See Pace

v. Capobianco*, 283 F.3d 1275, 1276, 1278 (11th Cir. 2002). However, "mere

conclusions and unsupported factual allegations are legally insufficient to defeat a summary judgment motion." *Ellis v. England*, 432 F.3d 1321, 1326 (11th Cir. 2005) (per curiam) (citing *Bald Mountain Park, Ltd. v. Oliver*, 863 F.2d 1560, 1563 (11th Cir. 1989)).  Because juries, not courts, make credibility determinations, courts must credit the nonmoving party's version of events when conflicts arise between the facts evidenced by the parties.  *Feliciano v. City of Miami Beach*, 707 F.3d 1244, 1252 (11th Cir. 2013).

## II.

The motor vehicle accident at issue here occurred one morning as Coram traveled north through dense rush-hour traffic as he drove on Interstate-20/59 near Bessemer to his job at the University of Alabama at Birmingham.  Doc. 12 at ¶¶ 10–12.  At the same time and on the same stretch of highway, Hagins, driving an 18-wheeler tractor-trailer leased from Calvo, was hoping to reach his destination in Somerset, Kentucky, to unload a delivery for his employer, Southwind.  *Id.* ¶ 13; doc. 30 at 3.  When right-lane traffic slowed, Hagins moved over to the left lane.  Docs. 12 at ¶ 13; 30 at 3, 5.  Coram, who was driving his Corvette in the left lane,[2] noticed the traffic in front of him had stopped, and so he slowed to a complete stop.

---

[2] The parties dispute whether Coram moved into the left lane after Hagins by driving past Hagins' tractor-trailer in the right lane and then pulling in front of Hagins.  *See* doc. 30 at 6.  The court, however, construes the facts in the light most favorable to Coram, the nonmovant.  *See Feliciano*, 707 F.3d at 1252.

Docs. 12 at ¶ 10; 28 at 5.  Coram then heard the application of a Jake Brake, looked in his rearview mirror, and saw Hagins' tractor-trailer coming toward him.  Docs. 28 at 5; 30 at 4.  Hagins' tractor-trailer collided with the back of Coram's vehicle at a speed of about 25 miles per hour.  Docs. 12 at ¶ 13; 28 at 4.  Coram alleges that he passed out during the collision, his Corvette "was totaled," and he received treatment for injuries at a hospital following the accident.  Docs. 12 at ¶ 14; 30 at 4, 7–8.  He further alleges that his head injury continues to "significantly impact[] his life and his work," and that he "remains on light duty at work to this day."  Doc. 12 at ¶ 14.

Hagins testified that he had been driving commercial motor vehicles for more than 20 years leading up to the accident.  Doc. 28 at 6 (citing doc. 28-2 at 6–7).  Hagins also testified that he became a leased driver for Calvo in 2013 and worked as a tractor-trailer driver for Southwind in that capacity.  *Id.*  Prior to Hagins joining Southwind, Southwind put Hagins through its hiring process.  *Id.*  Coram alleges that Southwind's hiring and training processes are deficient—that Southwind provides its "only training and guidance" to its commercial drivers through "its owner's daughter, Samantha Causey, the office manager, who does not have a [commercial driver's license], has never driven a truck, has not reviewed the commercial driver's license manual, and has not trained drivers on the manual."  Doc. 30 at 8.  For her part, Causey testified that Southwind's hiring process involves getting copies of an applicant's commercial driver's license and medical certificate

4

and submitting them to Southwind's insurance company to discover if the applicant has "any tickets or anything that's open."  Doc. 28 at 6.  Causey added that this procedure revealed no tickets for Hagins.  *Id.* at 7.

Coram alleges that Calvo knew that Hagins was driving its tractor-trailer in his employment with Southwind and that Southwind had more than 75 violations "in the areas of unsafe driving, including compliance problems (driving too long; no records; false reports); driver fitness (driving with a disqualified license); and vehicle maintenance problems (inadequate brakes for safe stopping; damaged windshield)."  Doc. 12 at ¶ 28.  Coram also alleges that Hagins' history of traffic offenses in multiple jurisdictions across the country "should have been well known" to both Calvo and Southwind "upon the exercise of ordinary care."  *Id.* ¶ 29.  Coram cites eight traffic offenses from 1996 to 2019 Hagins received in Kentucky, Missouri, Florida, and Virginia for speeding, failing to retain driving records, and failing to have an attached registered license plate and validation stickers.  *Id.*

### III.

Coram alleges that Hagins is directly liable for his injuries and that Calvo and Southwind are vicariously liable for Hagins' negligence and/or wantonness, docs. 12 at 4; 30 at 3, and that Calvo and Southwind are liable for the negligent entrustment, hiring, and/or supervision of Hagins, *id.* at 6.  In their motion for partial summary judgment, the defendants contend that the record contains no evidence that

Hagins acted wantonly, doc. 28 at 1–2, or that Hagins was an "incompetent driver," as required for negligent entrustment, hiring, and/or supervision, *id.* at 2.  Coram, recognizing that Alabama law may foreclose a finding that Hagins was "'incompetent' as a matter of law," concedes the latter point and does not oppose summary judgment on the negligent entrustment, hiring, and/or supervision claim. Docs. 30 at 3; 32 at 2.  Therefore, the only issue of contention is wantonness.

## A.

Alabama law defines "wantonness" as "[c]onduct which is carried with a reckless or conscious disregard of the rights or safety of others."  ALA. CODE § 6-11-20(b)(3).  The Supreme Court of Alabama has described "wantonness" as "the conscious doing of some act or the omission of some duty, while knowing of the existing conditions and being conscious that, from doing or omitting to do an act, injury will likely or probably result."  *Alfa Mut. Ins. Co. v. Roush*, 723 So. 2d 1250, 1256 (Ala. 1998) (citing *Bozeman v. Central Bank of the South*, 646 So. 2d 601 (Ala. 1994)).  Though wantonness requires a conscious or an intentional act, "the actor's knowledge may be proved by showing circumstances from which the fact of knowledge is a reasonable inference; it need not be proved by direct evidence." *Hicks v. Dunn*, 819 So. 2d 22, 24 (Ala. 2001) (quoting *Scott v. Villegas*, 723 So. 2d 642, 643 (Ala. 1998)).  "[I]t is not essential to prove that the defendant entertained a

specific design or intent to injure the plaintiff." *Alfa Mut. Ins. Co.*, 723 So. 2d at 1256.

In the context of automobile accidents, wantonness depends on the particular facts presented in each case. *Cheshire v. Putman*, 54 So. 3d 336, 342 (Ala. 2010) (quoting *Ex parte Anderson*, 682 So. 2d 467 (Ala. 1996)).   Speed alone is not sufficient, but it may rise to that level when coupled with other factors. *Hicks*, 819 So. 2d at 24.  Nor does a negligent failure to exercise "good judgment" while driving mean that the driver's conduct constitutes "reckless indifference to a known danger to inflict injury." *Cheshire*, 54 So. 3d at 344 (quoting *Ex parte Essary*, 992 So. 2d 5, 12 (Ala. 2007)).

In *Hicks*, the Supreme Court of Alabama held that the trial court should have presented a wantonness claim to the jury because there was evidence that the driver, Dunn, "was driving much faster than the posted speed limit and that he was not paying attention to the road."  819 So. 2d at 25.  The Court also noted evidence that Dunn "did not slow his speed despite the constructions signs and his knowledge that a restaurant into which patrons would likely be turning was on the other side of the hill he was cresting, obscured from his view." *Id.*  In light of this evidence, the Court held that the jury could have found that Dunn wantonly caused a collision that "propell[ed]" the other car 75 to 100 feet, "total[ing]" it for insurance purposes and causing the riders to suffer herniated discs that required surgery. *Id.* at 23, 25.

In *Cheshire*, the Supreme Court of Alabama held that the plaintiffs did not present sufficient evidence that the driver, Cheshire, had consciously disregarded his familiarity with the highway on which the accident occurred and operated his truck in a manner likely to cause injury. 54 So. 3d at 344. The evidence indicated the following: that Cheshire was familiar with the road in question, knew vehicles often stopped in the road waiting to make a left turn, did not recall seeing the plaintiff's vehicle in front of him before the accident, knew he "needed to alter his driving habits" in order to safely operate his truck while pulling a trailer, misjudged the distance it would take to stop his truck and trailer, knew that maneuvering his truck onto the shoulder of the highway "would have been a prudent response if he had had the time to respond," and knew that a driver should "keep a proper lookout while driving." *Id.* The Court determined that this evidence "merely establishe[d] that Cheshire made an error in judgment" when he rear-ended the plaintiffs' vehicle and caused it to collide with a utility pole. *Id.* at 337, 344–45. Thus, the Court held that the trial court erred in denying Cheshire's and his employer's motion for judgment as a matter of law as to wantonness. *Id.* at 345.

In *Essary*, the Supreme Court of Alabama held that a driver's rolling stop at an intersection requiring him to stop and yield for north- and south-bound traffic did not constitute wantonness. 992 So. 2d at 7, 12. Construed in the light most favorable to the plaintiffs, the evidence showed that the driver, Essary, had slowed to a rolling

stop at the intersection and attempted to cross the intersection between two moving

vehicles.  *Id.* at 12.  The Court reasoned that the evidence indicated that Essary

"knowingly entered the intersection" but not that "Essary's state of mind contained

the requisite consciousness, awareness, or perception that injury was likely to, or

would probably, result."  *Id.* (emphasis omitted).  The Court explained:

> The plaintiffs' characterization of Essary's attempt to cross the
> intersection between two vehicles as 'accelerating' after a 'rolling stop'
> to 'shoot the gap' does not elevate Essary's actual conduct—as
> observed by the plaintiffs—from the negligent failure to exercise good
> judgment to a wanton act constituting reckless indifference to a known
> danger likely to inflict injury. At best, the plaintiffs' evidence shows
> that Essary . . . made an error in judgment when he attempted to 'beat
> the traffic' or 'shoot the gap' by passing between Banks's vehicle and
> Burrell's vehicle.

*Id.*

## B.

Construed in the light most favorable to Coram, Hagins was aware that, when

driving a heavy vehicle in heavy traffic, he had to exercise greater caution because

it takes longer to stop a heavy, loaded vehicle than a lighter, empty one.  *See, e.g.*,

doc. 28-2 at 19.  On the day of the accident with Coram, Hagins initially drove the

79,600-pound, 18-wheeler tractor-trailer in the slower, right lane of the interstate.

Doc. 30 at 5.  Wanting to get to his destination "as early as possible," Hagins

switched to the faster-flowing left lane to bypass slower traffic in the right lane.  *Id.*

at 6.  Hagins then noticed that traffic in the left lane was "slowing down in front of

him" and that Coram, who was directly in front of Hagins, "had already come to a complete stop." *Id.* at 7 (citing doc. 31-1 at 3). Hagins slowed down but realized that he did not have enough stopping distance and "was going to bypass the traffic in the left lane on the left shoulder." *Id.* at 7 (citing doc. 28-2 at 24). Despite downshifting, getting "on his brakes," and deploying his Jake Brake, Hagins could not come to a complete stop. *Id.* at 5; doc. 28 at 5 (citing doc. 28-3 at 7). When Coram heard the application of the Jake Brake, he looked in his rearview mirror and saw the tractor-trailer coming toward him. Doc. 28-3 at 7–9. Coram "locked" his foot on the brake and turned his steering wheel to the left to avoid hitting the cars in front of him as they inched to the right. *Id.* at 7–9, 11. Hagins' tractor-trailer collided with the rear-end of Coram's Corvette, pushing the Corvette into the emergency lane and destroying it. *Id.*; docs. 12 at ¶ 14; 28 at 5; 30 at 7.

On this evidence, Coram characterizes Hagins as "[making] a dangerous gamble" while driving the tractor-trailer by wagering "that traffic in the left lane would start moving again before he would be required to stop, allowing him to continue on his way." Doc. 30 at 3, 9. Coram asserts that Hagins was "[p]ressed for time and trying to reach Somerset[,] Kentucky with a fully loaded eighteen-wheeler 'as early as possible,'" leading him to "rashly veer[] his truck into the left lane to bypass stopped traffic ahead of him." *Id.* Coram essentially asserts that Hagins' testimony proves Hagins decided to change lanes while aware that traffic in the

10

flowing left lane was slowed or stopped.  *See id.* at 12.  Coram thus concludes that "Hagins made a conscious decision when he took his gamble to change lanes" and that "a reasonable jury could infer that he knew traffic ahead of him was slowed or stopped and therefore serious injury to other drivers was likely to result." *Id.*

The evidence, construed in Coram's favor, establishes that Hagins consciously decided to switch from the right lane to the left lane to bypass slower traffic in the right lane.  However, a reasonable jury could not infer that Hagins did so "with a reckless or conscious disregard of the rights or safety of others."  ALA. CODE § 6-11-20(b)(3).  The evidence does not demonstrate that Hagins consciously failed to give himself adequate time and distance to stop "while knowing of the existing conditions and being conscious that, from doing or omitting to do an act, injury [would] likely or probably result." *See Alfa Mut. Ins. Co.*, 723 So. 2d at 1256. Rather, like the defendant-drivers in *Cheshire* and *Essary*, Hagins may have "made an error in judgment" when he attempted to make better time on his journey by moving to the left lane to bypass slower traffic in the right lane.  But, as in *Essary*, Coram's characterization of Hagins' conduct as making a "dangerous gamble" by "rashly veer[ing]" the tractor-trailer into the left lane "does not elevate [Hagins'] actual conduct—as observed by [Coram]—from the negligent failure to exercise good judgment to a wanton act constituting reckless indifference to a known danger likely to inflict injury." *Essary*, 992 So. 2d at 12.

11

Put another way, despite Coram's arguments to the contrary, the record does not show that Hagins abruptly moved the tractor-trailer from the right lane to the left lane while the left lane was stopped or did so with conscious awareness that his lane-change would lead to a collision.[3]  The record does not indicate that Hagins veered into the left lane suddenly, ignored warning signs, failed to pay attention to the road, drove over the speed limit, or otherwise operated the tractor-trailer while aware that his manner of driving was likely to cause injury.  *See Hicks*, 819 So. 2d at 25. Whether Hagins drove negligently remains a live issue, but the defendants' motion as to wantonness is due to be granted.[4]

---

[3] *Compare* doc. 30 at 12 ("[Hagins] made a conscious gamble that the traffic in the left lane would speed up before he would have to stop, essentially relying on other drivers to avoid a collision.") *with* doc. 32 at 3–4 ("That Hagins changed lanes to go around slower traffic necessarily means that the left lane was moving faster than the right lane. . . . [Hagins] did not recall how long he drove under 50 [mph], but he was 'actually in traffic' a few minutes before the accident.") *and* doc. 28-2 at 23–24 (describing how Hagins slowed from 65 mph to 55 mph when three-lane highway became two lanes and slowed again to 40 mph and then 25 mph in left-lane traffic before colliding with Coram).

[4] The defendants also argue that Hagins "is entitled to the presumption that people do not engage in self-destructive behavior." Doc. 28 at 15 (citing *Craft v. Triumph Logistics, Inc.*, 107 F. Supp. 3d 1218, 1221 (M.D. Ala. 2015)).  This rebuttable presumption states that, absent evidence of impaired judgment, Alabama courts "do not expect an individual to engage in self-destructive behavior" in cases of automobile accidents.  *See Essary*, 992 So. 2d at 12.  However, as Coram points out, this presumption assumes that "the dangerous behavior at issue is similarly likely to harm the perpetrator."  *See* doc. 30 at 15; *Craft*, 107 F. Supp 3d at 1221 (internal quotation marks omitted).  Indeed, the defendants acknowledge that the presumption "is inapplicable in cases when there is little likelihood that the truck driver would be injured."  Doc. 28 at 15 (citing *Griffin v. Modular Transp. Co.*, No. 2:12-CV-2378-WMA, 2014 WL 896627, at *3 (N.D. Ala. Mar. 6, 2014)).  The court agrees with Coram that "the matchup between a fully loaded eighteen-wheeler with a steel bumper and a fiberglass-body Corvette" is asymmetrical and that the risk of injury to Hagins was "not as real as the risk of injury" to Coram.  *See* doc. 30 at 17; *Griffin*, 2014 WL 896627, at *3.  Thus, Hagins is not entitled to the presumption on the facts alleged.

## IV.

The motion for partial summary judgment as to wantonness and negligent entrustment, hiring, and/or training, doc. 27, is due to be granted.  The court will enter a separate order in accordance with this memorandum opinion.

**DONE** the 7th day of October, 2021.

**ABDUL K. KALLON**
UNITED STATES DISTRICT JUDGE